UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                    :

BROADVISION, INC.,                   :       No. 08-CV-1478 (WHP)

                    Plaintiff,     :

                                   :       ECF Case

         - against -            :

                                   :

GENERAL ELECTRIC COMPANY and   :
THE MEDICAL PROTECTIVE COMPANY,   :

                    Defendants.  :

------------------------------------------------------------------ x

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT GENERAL ELECTRIC CO.'S MOTION TO DISMISS THE COMPLAINT

TANNENBAUM HELPERN
 SYRACUSE & HIRSCHTRITT LLP
900 Third Avenue
New York, New York 10022
(212) 508-6700
   Attorneys for Plaintiff BroadVision, Inc.

Of Counsel:

    L. Donald Prutzman

May 5, 2008

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 3

    A.    The BroadVision-General Electric Master License Agreement. ............................ 3

    B.    The Employers Re/MedPro Usage Rights. .......................................................... 7

    C.    BroadVision's Audits of the Usage Rights. ......................................................... 9

ARGUMENT ................................................................................................................. 10

I.    THE STANDARD ON A MOTION TO DISMISS ....................................................... 10

II.    THE COMPLAINT STATES A CLAIM FOR COPYRIGHT
    INFRINGEMENT AGAINST GENERAL ELECTRIC. ................................................. 11

    A.    The Complaint Pleads Infringing Acts for
        Which General Electric is Responsible. ............................................................. 11

        1.    General Electric Assumed Responsibility for
            MedPro's Acts under the MLA. ............................................................. 11

        2.    General Electric Had a "Substantial and Continuing
            Connection" to MedPro's Use of the Software. ........................................ 13

        3.    General Electric is Vicariously Liable
            for MedPro's Infringement. ................................................................... 14

    B.    THE COMPLAINT SUFFICIENTLY IDENTIFIES
        THE INFRINGED WORKS ................................................................................. 14

    C.    THE MLA DOES NOT AUTHORIZE SOFTWARE USAGE IN
        EXCESS OF THE USAGE RIGHTS LICENSED. .................................................. 15

III.    ADJUDICATION OF STATUTE OF LIMITATIONS
    ISSUES IS PREMATURE AT THIS STAGE. .......................................................... 17

IV.    PLAINTIFF'S STATE LAW CLAIMS ARE NOT
    PREEMPTED AND ARE PROPERLY PLEADED ..................................................... 20

A.    The State Law Claims are Not Preempted..............................................................20

B.    The State Law Claims are Properly Pleaded. ........................................................24

CONCLUSION ..........................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*Acorn Structures v. Swantz,*
  846 F.2d 923 (4th Cir. 1988) ...............................................................................22

*American Movie Classics Co. v. Turner Entertainment Co.,*
  922 F. Supp. 926 (S.D.N.Y 1996) ........................................................................23

*Architectronics, Inc. v. Control Sys.,*
  935 F. Supp. 425 (S.D.N.Y. 1996) .................................................................22, 23

*Armstrong v. Virgin Records, Ltd,*
  91 F. Supp. 2d 628 (S.D.N.Y. 2000) .....................................................................19

*Auscape Intern. v. Nat. Geog. Soc.,*
  409 F. Supp. 2d 235 (2004) ...................................................................................19

*Banff Ltd. v. Limited, Inc.,*
  869 F. Supp. 1103 (S.D.N.Y. 1994) ......................................................................14

*Barksdale v. Robinson,*
  211 F.R.D. 240 (S.D.N.Y. 2002).............................................................................19

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,*
  373 F.3d 296 (2d Cir. 2004) .............................................................................21, 24

*Bridgeport Music, Inc. v. Diamond time, Ltd.,*
  371 F.3d 883 (6th Cir. 2004) .................................................................................20

*Brignoli v. Balch Hardy & Scheinman, Inc.,*
  645 F. Supp. 1201 (S.D.N.Y. 1986) .................................................................22, 23

*Carell v. The Shuberg Organization, Inc.,*
  104 F. Supp. 2d 236 (S.D.N.Y. 2000) ...................................................................15

*Chambers v. Time Warner, Inc.,*
  282 F.3d 147 (2d Cir. 2002) ..................................................................................11

*Computer Assocs. Int'l, Inc. v. Altai, Inc.,*
  982 F.2d 693 (2d Cir. 1992) .............................................................................21, 22

*Data General Corp. v. Grumman Data Systems Corp.,*
  886 F. Supp. 927 (D. Mass. 1994)..........................................................................14

**Cases**                                                                          **Page**

*eScholar, LLC v. Otis Educational Systems, Inc.,*
    387 F. Supp. 2d 329 (S.D.N.Y. 2005) .................................................22, 23

*Faulkner v. Beer,*
    463 F.3d 130 (2d Cir. 1996) ............................................................3

*Favia v. Bronx Counsel of the Arts,*
    1995 WL 358750 (S.D.N.Y. June 14, 1995) ........................................19

*Felix the Cat Prods., Inc. v. California Clock Co.,*
    2007 WL 1032267 (S.D.N.Y. March 30, 2007) ...................................19

*Flynn v. Health Advocate, Inc.,*
    2004 WL 51929 (E.D. Pa. Jan 13, 2004) ..........................................15

*Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.,*
    111 F.3d 284 (2d Cir. 1997) ............................................................8

*Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.,*
    886 F.2d 1545 (9th Cir. 1989) .........................................................13

*Graham v. James,*
    144 F.3d 229 (2d Cir. 1998) ............................................................17

*Grandon v. Merrill Lynch & Co.,*
    147 F.3d 184 (2d Cir. 1998) ............................................................10

*Harper & Row Pubs., Inc. v. Nation Enters.,*
    723 F.2d 195 (2d Cir. 1983),
    471 U.S. 539 (1985) ......................................................................21

*Hotaling v. Church of Jesus Christ of Latter-Day Saints,*
    118 F.3d 199 (4th Cir. 1997) ...........................................................20

*In re Lavigne,*
    114 F.3d 379 (2d Cir. 1997) ............................................................8

*Int'l Audiotext Network, Inc. v. AT&T Co.,*
    62 F.3d 69 (2d Cir. 1995) ...........................................................3, 11

*Jordan v. Can You Imagine, Inc.,*
    485 F. Supp. 2d 493 (S.D.N.Y. 2007) ...............................................8

**Cases**                                                                                           **Page**

*Lennon v. Seaman,*
    2002 WL 109525 (S.D.N.Y. Jan. 28, 2002) .......................................................................12

*Lennon v. Seaman,*
    63 F. Supp. 2d 428 (S.D.N.Y. 1999) .............................................................................19, 22

*MAI Systems Corp. v. Peak Computer, Inc.,*
    91 F.2d 511 (9th Cir. 1993) ...............................................................................................18

*Marvullo v. Gruner + Jahr,*
    105 F. Supp. 2d 225 (S.D.N.Y. 2000) ...............................................................................12

*Master Sound Int'l, Inc. v. Polygram Latino U.S.,*
    50 U.S.P.Q. 2d 1859, 1999 WL 269958 (S.D.N.Y. May 4, 1999)........................................24

*Maurizio v. Goldsmith,*
    84 F. Supp. 2d 455 (S.D.N.Y. 2000) .................................................................................19

*Merchant v. Levy,*
    92 F.3d 51 (2d Cir. 1996) .................................................................................................19

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005) .........................................................................................................13

*Nat'l Basketball Ass'n v. Motorola, Inc.,*
    105 F.3d 841 (2d Cir. 1997) .............................................................................................21

*Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.,*
    991 F.2d 426 (8th Cir. 1993) .............................................................................................22

*Peter Pan Fabrics, Inc. v. Acadia Co.,*
    173 F. Supp. 292 (S.D.N.Y. 1959) ...................................................................................13

*Plunket v. Estate of Doyle,*
    2001 WL 175252 (S.D.N.Y. 2001) ...................................................................................15

*Polar Bear Prods., Inc. v. Timex Corp.,*
    384 F.3d 700 (9th Cir. 2004) .............................................................................................19

*ProCD, Inc. v. Zeidenberg,*
    86 F.3d 1447 (7th Cir. 1996) ....................................................................................21-22, 22

*Reid v. Am. Soc'y of Composers, Authors & Publishers,*
    1994 WL 3409 (S.D.N.Y. Jan. 5, 1994) ...........................................................................12

**Cases**                                                                                                    **Page**

*Repp .v Webber,*
    914 F. Supp. 80 (S.D.N.Y. 1996) ........................................................................19

*Roberts v. Keith,*
    2006 WL 547252 (March 7, 2006) .......................................................................19

*Rosner v. Codata Corp.,*
    917 F. Supp. 1009 (S.D.N.Y. 1996) ....................................................................19

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000) ..................................................................................11

*Sapon v. DC Comics,*
    62 U.S.P.Q.2d 1691 (S.D.N.Y. 2000) .................................................................19

*Seals v. compendia Media Group,*
    290 F. Supp. 2d 947 (N.D. Ill. 2003)...................................................................20

*Shapiro, Bernstein & Co. v. H. L. Green Co.,*
    316 F.2d 304 (2d Cir. 1963) ................................................................................14

*Sony Corp. of America v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) .............................................................................................13

*Strauss v. The Hearst Corp.,*
    8 U.S.P.Q.2d 1832, 1988 WL 18932 (S.D.N.Y. Feb. 19 1988) ..........................24

*Stone v. Williams,*
    970 F.2d 1043 (2d Cir. 1992) ..............................................................................19

*Taquino v. Teledyne Monarch Rubber,*
    893 F.2d 1488 (5th Cir. 1990) .............................................................................22

*Torah Soft Ltd. v. Drosnin,*
    224 F. Supp. 2d 704 (S.D.N.Y. 2002) .................................................................22

*TRW v. Andrews,*
    534 U.S. 19 (2001) ...............................................................................................19

*Vasquez v. Torres-Negron,*
    2007 WL 2244784 (S.D.N.Y. Jul. 11, 2007)........................................................19

*Villager Pond, Inc. v. Town of Darien,*
    56 F.3d 375 (2d Cir. 1995) ..................................................................................11

**Cases**                                                                  **Page**

*Wall Data Inc. v. Los Angeles County Sheriff's Dept.,*
   447 F.3d 769 (9th Cir. 2006) ..................................................................18

*Wrench LLC v. Taco Bell Corp.,*
   256 F.3d 446 (6th Cir. 2001) ..................................................................23

*Yurman Design Inc. v. Chaindom Enters., Inc.,*
   1999 Westlaw 1075942 (S.D.N.Y. Nov. 29, 1999).................................19

*Zitz v. Pereira,*
   119 F. Supp. 2d 133 (E.D.N.Y. 1999) ....................................................19


**Statutes**                                                               **Page**

Copyright Act, 17 U.S.C. § 301 .....................................................3, 20


**Miscellaneous**                                                          **Page**

Nimmer on Copyright § 12.4[A][1] ..............................................13

Nimmer on Copyright § 1.01[B][1] (1995).....................................21

Raymond T. Nimmer, Law of Computer Technology § 1:115 (updated April 2008) .................18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                                    :
BROADVISION, INC..,                                 :        No. 08-CV-1478 (WHP)
                                                    :
                          Plaintiff,                :
                                                    :             ECF Case
        - against -                                 :
                                                    :
GENERAL ELECTRIC COMPANY and                        :
THE MEDICAL PROTECTIVE COMPANY,                     :
                                                    :
                          Defendants.               :
                                                    :
------------------------------------------------------------------ x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT GENERAL ELECTRIC CO.'S
MOTION TO DISMISS THE COMPLAINT**

Defendant General Electric Company's motion to dismiss the complaint pursuant to Fed. R.

Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted ignores the most

significant aspect of the master license agreement between plaintiff and General Electric – on

behalf of its entire network of subsidiaries and affiliates – on which this action rests.  In that master

license agreement, General Electric, as the parent company of a vast enterprise and the Licensee of

plaintiff's computer software,  assumed responsibility for the entire enterprises' use of the software

and payment for that use.  This motion is largely an attempt to evade that responsibility.

**<u>Preliminary Statement</u>**

In 1999, plaintiff BroadVision, Inc. ("BroadVision"), a computer software developer, and

defendant General Electric, a conglomerate owning and operating many different businesses,

entered into a Master License Agreement for use of BroadVision's One-To-One computer software.

Under the agreement, General Electric licensed the software, on the terms specified, for the benefit of, and on behalf of, its entire network of subsidiaries, affiliates and joint venture partners. General Electric thus made itself, as the Licensee, contractually responsible for all of its subsidiaries' and affiliates' use of the software in accordance with the rights licensed. On this motion, it is now attempting to hide behind a "corporate veil" that it expressly contracted away in entering into the Master License Agreement and accepting the significant benefits it offered to the entire General Electric corporate enterprise.

As against General Electric, this action arises from one of General Electric's subsidiaries' violation of the Master License Agreement, and consequent infringement of the copyright in the One-to-One software, by making and using more copies of BroadVision's software than the usage rights granted under the Master License Agreement allowed. Based on the allegations of the Complaint, and the relevant underlying documents the parties have submitted, General Electric is legally responsible for this excessive use because it constitutes copyright infringement attributable to General Electric (i) directly under the license agreement, (ii) by virtue of the substantial and continuing connection between General Electric and its subsidiary that the license agreement and other circumstances established, or (iii) under a theory of vicarious liability.

General Electric is additionally, or in the alternative, liable (i) for breach of the Master License Agreement, including particularly its specific promises "not to exceed the scope of the licenses granted herein," and to pay for any overusage of the software, (ii) in *quantum meruit* for the reasonable value of the software usage, and/or (iii) for unjust enrichment.

We demonstrate below that, contrary to General Electric's contentions on this motion:

(a) BroadVision has properly pleaded copyright infringement by General Electric, including sufficiently identifying the allegedly infringed works. (See pp. 11 - 17);

2

(b) It is premature for the Court to rule on issues concerning application of the statute of limitations to the facts of this case at the pleading stage. (See pp. 17 - 20);

(c) The state law causes of action are not pre-empted by § 301 of the Copyright Act. Each includes an "extra element" in addition to violation of the legal or equitable rights protected by the Copyright Act. Further, the state law claims are properly pleaded. (See pp. 20 - 24).

## STATEMENT OF FACTS[1]

### A. The BroadVision-General Electric Master License Agreement.

BroadVision develops and licenses computer software and provides maintenance, support and updates for its software. BroadVision's software products include "One-To-One," a highly sophisticated software product family, consisting of a number of components and modules, designed for use by businesses that maintain web based applications with which employees, customers, potential customers, other constituents, and other website visitors ("Visitors") interact by supplying and receiving information. (Complaint ¶¶ 7-8.)

General Electric is a large conglomerate that owns and operates a number of businesses. Many of these businesses maintain websites that interact with employees, customers, potential customers, and other Visitors. (Complaint ¶ 9.) BroadVision's One-to-One software is well suited for use in connection with these websites.

---

[1]   The Statement of Facts is drawn from the allegations of the Complaint, the Master License Agreement submitted as Exhibit A to the Declaration of Robert Penchina, dated March 11, 2008 ("Penchina Dec"), and the purchase invoice for the software usage rights in issue, purchased pursuant to the Master License Agreement submitted as Exhibit A to the Affidavit of L. Donald Prutzman, sworn to May 5, 2008 ("Prutzman Aff"). We submit that the latter two documents, which, although not attached to the Complaint, are integral to and relied upon in the Complaint, may be considered on a motion to dismiss without converting the motion to one for summary judgment. *See Faulkner v. Beer*, 463 F.3d 130 (2d Cir. 2006); *Int'l Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

In 1999, BroadVision, as "Licensor" and General Electric as "Licensee" entered into a Master License Agreement (the "MLA") that allowed all of General Electric's businesses, whether operated directly by the parent company or indirectly, through a subsidiary or affiliate, to acquire specified rights to use the One-to-One software, together with related maintenance, support and upgrade services. (Complaint § 13; MLA.) Although General Electric was the Licensee and only signatory other than BroadVision, the MLA governed use of the software by the entire worldwide enterprise. To provide for enterprise-wide usage, the MLA defined the term "GE" to mean both General Electric Company (the parent and Licensee) and "all General Electric components, subsidiaries, affiliates, and joint-venture partners worldwide under the common control of GE."[2] (MLA preamble & § 1.0.) Section 2.0 of the MLA provided, "This Agreement shall apply to GE wherever situated, and Software may be used by GE and its officers and employees engaged in work on behalf of GE, whether on or off premises, worldwide." Thus, in effect, General Electric was contracting to license the BroadVision software for itself and any and all of its many subsidiaries and affiliates. (Complaint ¶ 14.) As a result, General Electric was able to license the software for its businesses at huge discounts (up to 60%) from the list price. (MLA Schedule A, at 17.)

The MLA provided three optional scenarios, with some additional variations, under which GE could acquire specified rights to use the One-to-One software. (MLA Sch. A, at 16-23; Complaint ¶ 14.) Under Option 1, GE was entitled to pay a onetime license fee of $1,500,000 to obtain the right to use an unlimited number of copies of software developer kits and tools (as opposed to "deployment licenses" or user profiles, discussed below) throughout its

---

[2]  To promote clarity, in this Memorandum BroadVision uses the term "General Electric" to refer to the parent company, and the term "GE" to refer to the entire enterprise as defined in the MLA.

entire enterprise for an 18-month period.  At the end of the 18 months GE would "declare the number of Developer Kits and tools that are in use" and receive an ongoing license to continue to use that number in perpetuity. (MLA Sch. A, at 16.)  GE did not elect Option 1.

Under Option 2, GE could license a "Starter Kit" for a GE Business for $500,000.  A "Starter Kit" consisted of a bundled package of the right to use a specified number of BroadVision One-To-One Enterprise Software Development Systems and One-To-One Web Application Development Systems and other related software.  Pursuant to the MLA, each Development License permitted a named developer to develop code for the One-To-One software being used.  As noted below, this action concerns the purchase of such a "Starter Kit." (Complaint ¶ 16; MLA Sch. A, at 17.)

Under Option 3, GE could license various components of the One-to-One software on an "a la carte" basis for specified license fees. (*Id.*)

Significantly, even though GE did not elect Option 1, the MLA provided that if the usage rights licenses that various GE Businesses ordered under Options 2 and 3 aggregated to $1.5 million within the first 18 months, GE would receive the benefit of Option 1, *i.e.,* unlimited usage rights, for the rest of the initial 18-month period or sixth months from the date the threshold was crossed, whichever was longer.[3]  (MLA Ex. A, at 16.)

In addition to licensing usage rights pursuant to Options 1, 2 or 3, use of the One-to-One software also required GE to license an adequate number of "Deployment Licenses" or user

---

[3]    This provision, in particular, strongly shows that the parties intended the MLA to be an agreement benefiting the entire GE enterprise as a whole, and not merely a paradigm for individual license agreements between a particular subsidiary or affiliate and BroadVision, for which General Electric bore no responsibility, as General Electric may attempt to argue.

profiles to meet its requirements.    Each Deployment License permitted the creation and

maintenance of a "user profile" for a Visitor to the website in connection with which the One-To-

One software was being used.    Pursuant to the MLA, The price per Deployment License

depended on the number of Deployment Licenses purchased and decreased as the aggregate

number of licenses purchased increased.    GE could license user profiles in amounts ranging from

100,000 at $3 per user to 50 million at 20 cents per user.    GE could license additional user

profiles as and when it needed them.    (Complaint ¶ 17; MLA Sch. A at 18.)

Thus, in summary, the MLA afforded GE the right to license specified usage rights for the

One-to-One software and specified numbers of user profiles.    License of both is necessary to use

the software and the amount of usage permitted is limited to the amount licensed.[4]    Significantly,

in the MLA, GE expressly promised, "not to exceed the scope of the licenses granted herein."

(MLA § 3.5, at 4.)

In addition, the MLA expressly contemplated the possibility that GE might divest a

business that was using the One-to-One software.    Section 3.4 provides in relevant part:

> GE may assign the Software solely in connection with the sale of
> all or substantially all of the assets of a GE Business, provided that:
> i) GE may only assign the number of copies of Software deployed
> in the GE Business at the date of divesture . . . ii) such assignee
> agrees in writing to the terms and conditions of this Agreement as
> such applies to the Software being assigned, and iii) such entity
> must sign an agreement with Licensor to cover continued
> deployment of Software.    Except for the foregoing, GE may not

---

[4]  Accordingly, General Electric's statement in its Memorandum of Law in Support of Defendant
General Electric Company's Motion to Dismiss, dated March 12, 2008 ("GE Mem") that
"Schedule A itself contains no limitations on the number of copies or users of One-To-One, but
sets forth a pricing schedule based on the number of copies or users" (GE Mem 3) is incorrect.
Usage was limited to the amount of usage licensed and paid for.    If that were not the case, there
would be no reason for the MLA to specify prices for particular amounts of usage.

assign or otherwise transfer the Software without the prior written consent of Licensor.

**B. The Employers Re/MedPro Usage Rights.**

This action concerns a particular set of usage rights that GE licensed for use by two subsidiaries engaged in GE's insurance and reinsurance business. Defendant The Medical Protective Company, one of those subsidiaries, provides medical professional liability insurance to physicians, dentists and other primary health care providers. (Complaint ¶ 11.) GE acquired MedPro prior to entering into the MLA, and operated it as a division, subsidiary or affiliate of Employers Reinsurance Corporation ("Employers Re"), which was, in turn, a division, subsidiary or affiliate of GE's "Insurance Solutions" business unit, known as "GEIS." (Complaint ¶ 12.)

Pursuant to the MLA, in December 1999, GE licensed a package of usage rights for the One-To-One software for the use and benefit of its insurance businesses operated as divisions, subsidiaries or affiliates of Employers Re (the "Usage Rights"). The package consisted of the Option 2 Starter Kit, provided for in the MLA, for a license fee of $500,000, and 100,000 Deployment Licenses (giving the right to create and maintain a maximum of 100,000 user profiles) for a license fee of $250,000, together with maintenance and support and software upgrade support for an additional $120,000. A BroadVision invoice, denominated Invoice No. 10031, dated December 10, 1999 (Prutzman Aff, Ex. A), documents the license of the Usage Rights (the "Invoice").[5]

---

[5]  General Electric notes that the MLA specified the use of a "Product Order Form" (defined to mean "a purchase order in the form of Schedule A issued to Licensor by GE with a specific reference to this Agreement) in connection with GE's licensing of software usage rights (MLA §§ 1.0, p. 2, 12.0, pp. 10-11) and asserts that no Product Order Form was used in connection with the Usage Rights license in issue here. (GE Mem 4-5.) That is not necessarily correct. Significantly, the Invoice expressly refers to "PO# 10641," "PO# 10642," and "PO# 10643."

As alleged in the Complaint, the Employers Re insurance businesses, which included MedPro, used and shared the Usage Rights. It has recently come to light that their usage far exceed the Usage Rights, by both using more named developers than were licensed and by creating and maintaining more user profiles than the number of Deployment Licenses available permitted. (Complaint ¶¶ 19, 29.)

Within the past three years, General Electric has divested both MedPro and Employers Re. However, GE made no effort to comply with the divesture license transfer provision of § 3.4 of the MLA in either case. MedPro was sold on or about July 1, 2005. (Complaint ¶ 22.) Employers Re was sold on or about June 12, 2006. (Complaint ¶ 25.)

After MedPro's divestiture, BroadVision and MedPro entered into their own separate license agreement dated as of, and with respect to the period commencing, September 30, 2005 (the "MedPro MLA"). (Complaint ¶ 23; Penchina Dec, Ex. B.) That separate license agreement is part of this case with respect to MedPro,[6] but does not involve General Electric and is not involved in this motion.[7]

---

Thus, Product Order Forms may well have been issued and they may come to light in discovery. In any event, even if Product Order Forms were not used in strict compliance with the MLA, it would constitute, at most, an immaterial, and mutually agreed, non-compliance with a procedural requirement, or a mere irregularity, of no significance to this case. *See, e.g., In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997) (immaterial breach does not discharge other party's obligation to perform); *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (same); *Jordan v. Can You Imagine, Inc.*, 485 F. Supp. 2d 493, 498 (S.D.N.Y. 2007) (minor breach not of the essence does not affect other party's obligation to perform).

[6]    BroadVision alleges that MedPro's post September 30, 2005 software usage exceeded that allowed under the MedPro MLA and accordingly MedPro is liable for copyright infringement, breach of contract and other claims arising from that usage. (Complaint ¶¶ 41, 48-50.)

[7]    General Electric appears to suggest (GE Mem 5) that the standard integration clause in the MedPro MLA, providing that it "constitutes the complete and exclusive agreement between" BroadVision and MedPro "*with respect to the subject matter hereof*" and "supersedes all

However, until September 29, 2005, both before and after its divestiture, MedPro was using the One-to-One software in excess of the Usage Rights. That usage was pursuant to the MLA, and the Complaint alleges that General Electric is responsible for it and liable for it.

### C. BroadVision's Audits of the Usage Rights.

Pursuant to the MLA (§ 16.0), BroadVision has the right to audit the records of GE and its businesses, or former businesses, using the One-To-One software to ascertain that usage of the software conforms to the usage rights licensed and that appropriate license fees have been, or are being, paid for all usage. If an audit reveals an underpayment, BroadVision is entitled to be paid any additional amounts due, and if the underpayment exceeds five percent (5%) of the license fees paid, BroadVision is also entitled to be paid the reasonable costs of conducting the audit. (Complaint ¶ 28.)

In early April, 2007, with the consent and cooperation of Employers Re (which is now known as Westport Insurance Corp.), BroadVision conducted an audit of Employers Re's usage of the One-To-One software. The audit showed that Employers Re alone was using the One-To-One software significantly in excess of the Usage Rights. Indeed, the audit showed that Employers Re alone was using more than all of the Usage Rights that GE had licensed for the benefit of Employers Re and MedPro. Furthermore, the audit showed that the overuse by Employers Re alone exceeded the Usage Rights between 2002 and 2005 prior to General

---

proposals, oral, or written, all previous negotiations, and all other communications between the parties *with respect to the subject matter hereof*" (emphasis supplied) means that the MedPro MLA somehow supersedes the GE MLA with respect to usage of the software before the inception of the MedPro MLA. The suggestion is a red herring. Plainly the "subject matter" of the MedPro MLA was MedPro's prospective use of the software and that is all that the MedPro MLA affects.

9

Electric's divesture of Med Pro, and in turn prior to the effective date of the MedPro MLA. (Complaint ¶ 29.)

On April 9, 2007, BroadVision notified MedPro by letter that it desired to conduct an audit of MedPro's usage of the One-To-One software both before and after the effective date of the MedPro MLA at MedPro's premises and sought to arrange a mutually convenient date for the audit.

The audit began on April 26, 2007. BroadVision was permitted to audit the records relating to the MedPro MLA, but MedPro refused access to the records necessary to audit its pre-MedPro MLA usage under the GE MLA. MedPro first asserted that it could not permit audit of those records without General Electric's consent. However, even when General Electric gave its express written consent at BroadVision's request, MedPro continued to refuse to make the relevant records available. (Complaint ¶¶ 30-33.)

Even without the records, however, BroadVision is able to allege that MedPro's usage of the One-To-One software under the GE MLA exceeded the Usage Rights. That allegation is not conclusory or based on mere conjecture as General Electric contends. (GE Mem 14.) It is solidly grounded on the results of the Employers Re audit, which showed that Employers Re's usage alone had exhausted and exceeded all of the Usage Rights. (Complaint ¶ 34.)

## ARGUMENT

### I.

### THE STANDARD ON A MOTION TO DISMISS.

On a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in plaintiff's favor. *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). The complaint is deemed to

include any documents incorporated in it by reference, as well as documents that the plaintiff knew about and relied upon in bringing the suit. *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000); *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Here, that includes the MLA and the Invoice. Although the court is not constrained to accept allegations in respect of the construction of an agreement, at the motion to dismiss stage the court will strive to resolve any contractual ambiguities in plaintiff's favor. *Int'l Audiotext Network, Inc. v. AT&T Co.*, 63 F.3d 69, 72 (2d Cir. 1995). The issue on a motion to dismiss "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support claims." *Villager Pond, Inc. v.Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995).

## II.

### THE COMPLAINT STATES A CLAIM FOR COPYRIGHT INFRINGEMENT AGAINST GENERAL ELECTRIC.

#### A. The Complaint Pleads Infringing Acts for Which General Electric is Responsible.

General Electric argues that the complaint fails to state a claim against it for copyright infringement because it does not plead infringing acts by General Electric, the parent company, itself. (GE Mem 7-9.) This argument ignores the allegations of infringement by MedPro both during and after General Electric's ownership for which General Electric is responsible under the MLA. General Electric is responsible for MedPro's acts under any one of three theories of liability:

##### 1. General Electric Assumed Responsibility for MedPro's Acts under the MLA.

As described above (at p. 4), in the MLA, to receive the extremely favorable pricing BroadVision was offering for its entire enterprise, General Electric expressly agreed to define

itself to encompass all of its subsidiaries and affiliates, including MedPro.  This was accomplished by making "GE" the Licensor and defining "GE" to mean "all General Electric components, subsidiaries, affiliates, and joint-venture partners worldwide under the common control of GE."  Thus, for purposes of the MLA and licensing BroadVision's software for its entire enterprise, General Electric contracted away the boundaries between corporate parents and subsidiaries that ordinarily exist.  In effect, General Electric, the parent, agreed to be responsible for its subsidiaries', including MedPro's, use of BroadVision's software as if MedPro were not a separately incorporated entity.  Logically, that includes responsibility for MedPro's copyright infringement in the course of using the software, just as General Electric would be responsible for infringement by its direct employee within the scope of his or her employment.

General Electric's argument that the Complaint "contains no facts whatsoever to support piercing of their corporate veils in order to hold GE liable in the event MedPro or Employers Re made excess use of software given to them by BV" (GE Mem 9) is entirely inapposite.  There is no need for BroadVision to pierce any corporate veils because General Electric contracted them away in the MLA and cannot now hide behind them.[8]

---

[8]  The cases General Electric relies on are similarly inapposite here.  *Marvullo v. Gruner + Jahr,* 105 F. Supp. 2d 225 (S.D.N.Y. 2000); *Lennon v. Seaman,* 2002 WL 109525 (S.D.N.Y. Jan. 28, 2002); and *Reid v. Am. Soc'y of Composers, Authors & Publishers,* 1994 WL 3409 (S.D.N.Y. Jan. 5, 1994) all involve conclusory allegations of infringement with no, or minimal, factual support pleaded and insufficient to give the other party notice of what the claim involved.  The Complaint here contains ample notice of what the copyright claim is and the basis for General Electric's liability.

    **2.   General Electric Had a "Substantial and Continuing Connection" to MedPro's Use of the Software.**

Even if the MLA did not dissolve the corporate separation between MedPro and General Electric by contract, the Supreme Court has made clear that in appropriate circumstances the Copyright Act imposes liability for infringing acts committed by others. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 929-30 (2005); *see Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417 (1984). One of those circumstances is where there is "a substantial and continuing connection between a parent and its subsidiary" with respect to infringing acts. *See Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.,* 886 F.2d 1545, 1553 (9th Cir. 1989); *Peter Pan Fabrics, Inc. v. Acadia Co.,* 173 F. Supp. 292, 298-99 (S.D.N.Y. 1959); Nimmer on Copyright § 12.4[A][1] at 12-73. For example, in *Frank Music,* the Ninth Circuit found a parent corporation liable for its subsidiaries' copyright infringement where, among other factors, the subsidiary was wholly owned by the parent, the subsidiaries' activities had the collateral purpose of promoting the parent's business interests and the parent assisted the subsidiary in conducting the activity that was found infringing.

The facts now available show that the connection between General Electric and MedPro with respect to the latter's use of the software shares some common elements with the parent-subsidiary connection in *Frank Music.* MedPro was wholly owned by General Electric. The MLA's pricing structure offered benefits to the entire GE enterprise from the Employers Re/MedPro Usage Rights license (see pp. 4-8 above). And General Electric assisted MedPro in conducting the activity by entering into the enterprise-wide MLA. Other relevant factors that bear on the substantial and continuing nature of the connection may emerge in discovery.

### 3.  General Electric is Vicariously Liable for MedPro's Infringement.

It is well established that a parent corporation is vicariously liable for its subsidiary's infringement if it had (1) the right and ability to supervise the infringing activity of the subsidiary, and (2) an obvious and direct financial interest in the exploitation of the copyrighted materials. *Data General Corp. v. Grumman Data Systems Corp.,* 886 F. Supp. 927 (D. Mass. 1994); *Banff Ltd. v. Limited, Inc.,* 869 F. Supp. 1103 (S.D.N.Y. 1994); *see Shapiro, Bernstein & Co. v. H. L. Green Co.,* 316 F.2d 304, 307 (2d Cir. 1963). Here, General Electric had the right and ability to supervise MedPro's use of the software not only by virtue of its status as owning shareholder, but also as the Licensee under the MLA pursuant to which MedPro used the software. Indeed, the MLA gave it an incentive, if not a duty, to supervise because it had assumed direct financial responsibility for the enterprise-wide use of the software. General Electric also had an obvious and direct financial interest both because it owned MedPro and received its profits, and because under the MLA's pricing structure its entire enterprise received actual and potential financial benefits from the license of usage rights for MedPro's use.

### B.  The Complaint Sufficiently Identifies the Infringed Works.

General Electric next argues that BroadVision's Complaint does not sufficiently identify the works that are the subject of the infringement claim. (GE Mem 9-10.) That is plainly not the case. The Complaint clearly identifies the infringed work as the One-to-One software. (Complaint ¶¶ 8, 19-21, 36-37, 41.) Further, the Complaint pleads BroadVision's ownership (Complaint ¶ 36) and registration of the copyright and specifically identifies the sixteen

registration certificates (Complaint ¶ 37)[9]. Even if the One-To-One software is construed to be multiple "works" because there are multiple registrations, the Complaint is still more than sufficient. *Carell v. The Shubert Organization, Inc.*, 104 F. Supp. 2d 236, 250-51 (S.D.N.Y. 2000). (identification of 28 makeup designs as the works at issue for which plaintiff has valid copyright registration, allegation of ownership of some, if not all, designs, and allegations that designs were published in national and international stage productions and videos and illegally used in certain commercial products sufficient to state copyright claim even though each individual infringement not specified).[10]

### C. The MLA does not Authorize Software Usage in Excess of the Usage Rights Licensed.

General Electric argues that the MLA grants GE a license to use the One-To-One software without limit and that the MLA only obliges GE is pay for what it uses. Accordingly, neither General Electric nor MedPro could have infringed the copyright because any usage in any amount was licensed. (GE Mem 13-17.) That is plainly a misreading of the MLA.

---

[9]  One reason there are multiple registration certificates is that computer software, by its very nature, evolves and is updated, resulting in a new "version," which is a derivative work of the prior versions. The registration for a new "version" covers the changes from the last version, in roughly the same way that the registration of a new edition of a book covers the changes from prior editions.

[10]  The cases General Electric relies on are all readily distinguishable. In *Flynn v. Health Advocate, Inc.*, 2004 WL 51929 (E.D. Pa. Jan 13, 2004), the plaintiff alleged that it owned a registered copyright in an unspecified "collection of works" by the plaintiff defined as the "Copyrighted Material," and that the defendants infringed by "distributing to the public promotional and other written material" copied from the Copyrighted Materials. The court found those allegations insufficiently specific but granted leave to replead. In *Plunket v. Estate of Doyle*, 2001 WL 175252 (S.D.N.Y. 2001), the court found it insufficient for plaintiff to provide a multi-page schedule of the works of Sir Arthur Conan Doyle, identify copyright registration numbers for only nine of the works, but contend that the copyright claims were not limited to those works, and dismissed the copyright claims with leave to replead.

The basic license grant, on which General Electric relies, provides, "In consideration of payment to be made by GE to Licensor pursuant to Schedule A of this Agreement, Licensor grants and agrees to grant GE a non-exclusive perpetual, non-transferable (except as set forth in this Agreement), worldwide license(s) to use and/or reproduce Software on Computers and Networks *under the terms of this Agreement.* (MLA § 3.1, emphasis supplied.) The language "under the terms of this Agreement" makes it clear that the license is limited to use in compliance with the MLA.[11]    Further, in § 3.5 of the MLA, GE expressly "agrees not to exceed the scope of the licenses granted herein." That language would be meaningless if the parties had intended an unlimited license.

The structure of Schedule A, described above (at pp. 4-5) also demonstrates that the parties did not intend an unlimited license. It specifies limits on the usage rights that pertain to the various Options under which usage rights were available. For example, Option 2, which is in issue in this case, specifically lists the amount of each type of usage that was authorized as part of the bundled "Starter Kit." (MLA, Sch. A at 17.) Schedule A further specifies the need for GE to purchase an adequate number of user profiles to meet its needs. (*Id.* at 18.) If the parties had intended an unlimited license with an obligation to pay for whatever usage was made, there would have been no need for the carefully negotiated structure of optional methods for purchasing various packages of usage rights, which GE expressly agreed not to exceed. If the parties had intended that there were no limits on usage, but merely an obligation to pay for all usage, they could easily have said that.

---

[11]    General Electric does not dispute that even where a non-exclusive license is granted, use in excess of the rights licensed constitutes infringement. (GE Mem 14.)

Because General Electric's interpretation of the MLA as granting an unlimited license that cannot be infringed is incorrect, it follows that software usage in excess of the Usage Rights licensed constitutes copyright infringement. It is important to note, however, that in the event the Court should agree with General Electric's interpretation, on this motion or at a later stage, BroadVision would nevertheless have a claim here for breach of contract for failure to pay for the software used, as General Electric acknowledges. (GE Mem 15.) Moreover, since copyright infringement would not be involved, preemption of the breach of contract claim would not be an issue.

*Graham v. James,* 144 F.3d 229 (2d Cir. 1998), on which General Electric relies, is not on point here. In that case Graham had a license to make and sell an unlimited number of copies of the work but was obligated to pay James royalties for each copy sold, which he did not do. The issue was whether the failure to pay royalties was a condition of the license that deprived Graham of its benefit. The court held that it was not. Here, Broadvision is not contending that failure to pay royalties vitiated a license. Its position is that usage in excess of the Usage Rights licensed exceeds the scope of the license and is therefore infringing.

Accordingly, as demonstrated above, the Complaint states a claim for copyright infringement against General Electric.

### III.

### ADJUDICATION OF STATUE OF LIMITATIONS ISSUES IS PREMATURE AT THIS STAGE.

Although the Court may need to address statute of limitations issues at some point in this case, we submit that no such issues are ripe for adjudication at this stage and may become moot as discovery proceeds. That is because it is not yet clear that BroadVision will need to rely on

any infringing copying by GE or MedPro predating February 13, 2005 (three years prior to the filing of the Complaint) to establish its copyright infringement claims. This follows from the nature of computer software. A copy of software is made whenever the software is used, causing the computer to copy it to Random Access Memory.[12]  *See MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 518 (9th Cir. 1993). Assuming the One-To-One software was in active use as of February 13, 2005, it is likely that infringement for which General Electric is responsible took place from that time through September 29, 2005, after which MedPro used the software under the MedPro MLA.[13]

It is also clear at this stage that a ruling on statute of limitations issues is unlikely to result in dismissal of the copyright claim, but could only limit it as to potential time frame. It is at least clear that BroadVision alleges some infringement after February 13, 2005 for which General Electric is potentially liable.

If BroadVision eventually seeks to rely on copying that occurred before February 13, 2005, two statute of limitations issues will then need to be addressed. The first would be the

---

[12]  Further, the "safe harbor" provision of § 117 of the Copyright Act, 17 U.S.C. § 117, which permits copying of an owned copy of computer software under some circumstances, does not apply here because GE did not own any copies of the software. It was purely a licensee. (MLA § 4.0.)  *See Wall Data Inc. v. Los Angeles County Sheriff's Dept.,* 447 F.3d 769, 784 (9th Cir. 2006) ("[I]f a software developer retains ownership of every copy of software, and merely licenses the use of those copies, § 117 does not apply."); *MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511 at n.5 (9th Cir. 1993); *see also* Raymond T. Nimmer, Law of Computer Technology § 1:115 (updated April 2008) ("[C]ourts hold that a licensee is not an owner of a copy even if the terms of the license agreement are silent on copy ownership. . . . Section 117 exemptions do not apply to licensees.").

[13]  Contrary to General Electric's position that its responsibility for MedPro's infringement could not extend past MedPro's divestiture on July 1, 2005 (GE Mem 12), it is BroadVision's position that General Electric is responsible for MedPro's infringement through the inception of the MedPro MLA. That is because even after divestiture MedPro continued to use the software

difficult issue of whether the Copyright Act statute of limitations begins to run upon "injury" (*i.e.*, when the alleged wrongful act occurs) or upon "discovery" (*i.e.*, when plaintiff discovered or reasonably should have discovered the wrongful act). The existing Second Circuit authority supports the "discovery" rule, *Merchant v. Levy,* 92 F.3d 51 (2d Cir. 1996); *Stone v. Williams,* 970 F.2d 1043 (2d Cir. 1992), although district court cases in the circuit are split with some decisions supporting discovery[14] and some injury.[15]

One leading case supporting the injury rule, *Auscape Intern. v. Nat. Geog. Soc.,* 409 F. Supp. 2d 235 (2004), reasoned, among other things, that the Supreme Court's 2001 decision in *TRW v. Andrews,* 534 U.S. 19 (2001), reversing application of a discovery rule under the Fair Credit Reporting Act, constituted a rejection of the previously dominant view that federal courts should apply an injury rule only when Congress explicitly so provides and meant that courts should look to other indicia of intent in determining when a particular statute of limitations has accrued. However, in a post *TRW* copyright case, the Ninth Circuit concluded that the discovery rule applied. *Polar Bear Prods., Inc. v. Timex Corp.,* 384 F.3d 700 (9th Cir. 2004). Other

---

pursuant to the MLA and General Electric failed to comply with the MLA's provisions for license transfer upon divestiture. (MLA § 3.4.)

[14]   *E.g., Felix the Cat Prods., Inc. v. California Clock Co.,* 2007 WL 1032267 at *2 (S.D.N.Y. March 30, 2007); *Sapon v. DC Comics,* 62 U.S.P.Q.2d 1691, 1695 (S.D.N.Y. 2000); *Armstrong v. Virgin Records, Ltd,* 91 F. Supp. 2d 628, 640 (S.D.N.Y. 2000); *Maurizio v. Goldsmith,* 84 F. Supp. 2d 455, 461 (S.D.N.Y. 2000); *Yurman Design Inc. v. Chaindom Enters., Inc.,* 1999 Westlaw 1075942 at *7 (S.D.N.Y. Nov. 29, 1999); *Zitz v. Pereira,* 119 F. Supp. 2d 133, 141 (E.D.N.Y. 1999); *Rosner v. Codata Corp.,* 917 F. Supp. 1009, 1019 (S.D.N.Y. 1996).

[15]   *E.g., Vasquez v. Torres-Negron,* 2007 WL 2244784 at *7 (S.D.N.Y. Jul. 11, 2007); *Roberts v. Keith,* 2006 WL 547252 (March 7, 2006); *Auscape Intern. v. Nat. Geog. Soc.,* 409 F. Supp. 2d 235 (2004); *Barksdale v. Robinson,* 211 F.R.D. 240, 245 (S.D.N.Y. 2002); *Lennon v. Seaman,* 63 F. Supp. 2d 428, 433 (S.D.N.Y. 1999); *Favia v. Bronx Counsel of the Arts,* 1995 WL 358750 at *2 (S.D.N.Y. June 14, 1995); *Repp .v Webber,* 914 F. Supp. 80, 83 (S.D.N.Y. 1996).

circuits, in decisions both pre- and post- *TRW*, also follow the discovery rule. *E.g., Bridgeport Music, Inc. v. Diamond time, Ltd.,* 371 F.3d 883, 889 (6th Cir. 2004); *Hotaling v. Church of Jesus Christ of Latter-Day Saints,* 118 F.3d 199, 202 (4th Cir. 1997). This court should wait until the record is more fully developed and it is clear that a decision is necessary before ruling on such a potentially key issue over which courts are in disagreement.

The second statute of limitations issue that we submit should await further development of the record is whether MedPro's refusal of BroadVision's request for an audit of the records for usage of the software pursuant to the MLA equitably tolled the statute, and if so for how long. At least one case has held that refusal of a requested audit constitutes active concealment that tolls the statute of limitations on a copyright claim. *Seals v. Compendia Media Group,* 290 F. Supp. 2d 947, 951 (N.D. Ill. 2003).

Accordingly, statute of limitations issues need not be decided now. They should await further development of the record and may become moot.

## IV.

## PLAINTIFF'S STATE LAW CLAIMS ARE NOT PREEMPTED AND ARE PROPERLY PLEADED

General Electric argues that § 301 of the Copyright Act, 17 U.S.C. § 301, preempts Broadvision's three state law claims against it for breach of contract, *quantum meruit* and unjust enrichment (GE Mem 17-22) and that the state law claims are improperly pleaded (GE Mem 22-23). Both arguments are incorrect.

### A.    The State Law Claims are Not Preempted.

It is well established that § 301 of the Copyright Act preempts only those state law claims that "may be abridged by an act which, in and of itself, would infringe one of the exclusive

rights" protected by federal copyright law. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) (quoting *Harper & Row Pubs., Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds,* 471 U.S. 539 (1985)). However, if an "extra element" is "required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no preemption." *Computer Assocs.*, 982 F.2d at 716 (quoting Nimmer on Copyright § 1.01[B][1], at 1-14-15 (1995)); *accord Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004); *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997).

BroadVisions's claim that General Electric breached the MLA is based on two express promises that GE made in the MLA. The need to prove these promises provides the "extra element" in addition to the acts of reproduction of the software that prevents preemption. First, in § 3.5 of the MLA GE expressly agreed "not to exceed the scope of the licenses granted herein." Second, in § 16.0 of the MLA GE agreed that BroadVision "may audit GE's records to ensure that license and other fees have been properly paid in compliance with this Agreement" and that "If an audit reveals that GE has underpaid its total fees by more than five percent (5%), then GE shall pay Licensor's reasonable costs of conducting the audit, in addition to the underpaid amount." The latter promise obligates GE to pay royalties for any usage of the software in excess of the usage rights licensed that is found upon audit, in addition to paying the cost of the audit if the amount due exceeds five percent of the amount paid.

Although the Second Circuit has not addressed the issue, at least four other circuits have held that state law breach of contract claims are not preempted because the need to prove a contractual promise provides the "extra element." *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447,

1454 (7th Cir. 1996); *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426,

433 (8th Cir. 1993); *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir. 1990);

*Acorn Structures v. Swantz,* 846 F.2d 923, 926 (4th Cir. 1988).  As Judge Easterbrook explained

in *ProCD*:

> Rights "equivalent to any of the exclusive rights within the general
> scope of copyright" are rights established *by law* – rights that
> restrict the options of persons who are strangers to the author.
> Copyright law forbids duplication, public performance, and so on,
> unless the person wishing to copy or perform the work gets
> permission; silence means a ban on copying.  A copyright is a right
> against the world.   Contracts, by contrast, generally affect only
> their parties; strangers may do as they please, so contracts do not
> create "exclusive rights."

86 F.3d at 1454 (emphasis in original).

Numerous decisions in this district are in agreement that the promise inherent in a

contractual agreement, by itself, provides the "extra element."  *E.g., eScholar, LLC v. Otis*

*Educational Systems, Inc.,* 387 F. Supp. 2d 329, 332 (S.D.N.Y. 2005) (existence of explicit

contractual rights makes a breach of contract claim qualitatively different from a claim for

copyright infringement); *Torah Soft Ltd. v. Drosnin,* 224 F. Supp. 2d 704 (S.D.N.Y. 2002)

(agreement not to distribute software in excess of rights granted provides "extra element");

*Lennon v. Seaman,* 63 F. Supp. 2d 428, 437 (S.D.N.Y. 1999) ("greater weight of authority

indicates that breach of contract actions are generally found not to be preempted by the Copyright

Act"); *Architectronics, Inc. v. Control Sys.,* 935 F. Supp. 425, 438 (S.D.N.Y. 1996) (breach of

contract not equivalent to copyright because contract claim requires "extra element" – a promise

by defendant); *Brignoli v. Balch Hardy & Scheinman, Inc.,* 645 F. Supp. 1201, 1205 (S.D.N.Y.

1986) (contractual term provides "extra element").

22

Two of these cases held that contractual promises similar to those GE made here provide the "extra element" that prevents preemption. *eScholar*, 387 F. Supp. at 333 ("[p]laintiff's breach of contract claim must survive to the extent it seeks to enforce contractual rights to audit books and receive royalty fees"); *Brignoli*, 645 F. Supp. at 1205 ("a promise to pay plaintiff for use of his product" is "an element beyond unauthorized reproduction and use").

General Electric's reliance on *American Movie Classics Co. v. Turner Entertainment Co.*, 922 F. Supp. 926 (S.D.N.Y 1996), is misplaced. Although the case holds that a breach of contract claim is preempted if it is merely based on allegations that the defendant did something that the copyright laws reserve exclusively to the plaintiff,[16] it also notes that "if the breach of contract claim is based on allegations that the parties' contract creates a right based upon a party's contractual promise – and the plaintiff is suing to protect that contractual right, then the claim is not preempted." *Id.* at 931. BroadVision's claim here falls squarely within that language.

BroadVision's *quantum meruit* claim is based not on an express contractual promise to pay royalties for usage of the software in excess of the rights licensed, but on an agreement to pay for usage implied from the facts that it is usual and customary to pay for usage of software such as One-To-One and that GE used the software knowing that. (Complaint ¶¶ 52-56.) That agreement implied from the facts serves as the "extra element" that avoids preemption in the same way that the express promise to pay for excess software usage provides the "extra element" for the breach of contract claim. In *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446 (6th Cir. 2001), the court held that a contract implied-in-fact to pay for the use of plaintiffs' creative work

---

[16]    Significantly, then-Judge Mukasey expressly declined to follow *American Movie Classics* in *Architectronics*, 935 F. Supp. at 440-41.

provided an "extra element" and was not preempted.   The same result should apply to BroadVision's *quantum meruit* claim here.   General Electric's citation of *Briarpatch Ltd,* 373 F.3d at 307 (GE Mem 21) is misplaced.   *Briarpatch* did not involve a *quantum meruit* claim and the statement relied upon is purely dicta.   *Master Sound Int'l, Inc. v. Polygram Latino U.S.,* 50 U.S.P.Q. 2d 1859, 1999 WL 269958 (S.D.N.Y. May 4, 1999) and *Strauss v. The Hearst Corp.,* 8 U.S.P.Q.2d 1832, 1988 WL 18932 (S.D.N.Y. Feb. 19 1988), which General Electric also cites (GE Mem 21-22), did not involve claims similar to this case and contain no reasoning or analysis of why a *quantum meruit* claim should be preempted.

In addition to the above arguments showing why the state law claims are not preempted, we note that in the event that the Court should agree with General Electric's interpretation of the MLA and find that it granted an unlimited license to use the software, under General Electric's theory copyright infringement would not be possible and there could be no infringement claim. If so, then the underpinnings for General Electric's preemption argument would no longer exist and there could be no preemption.   The Court would, however, continue to have subject matter jurisdiction because there is complete diversity between plaintiff and both defendants.

**B.     The State Law Claims are Properly Pleaded.**

General Electric's other attacks on the state law claims merely reprise its prior arguments that the Complaint does not identify any infringing acts by General Electric itself and that the MLA granted an unlimited license to use the One-To-One software.   We rely on our prior refutation of these arguments.

## CONCLUSION

For the foregoing reasons, General Electric's motion to dismiss the Complaint for failure to state a claim upon which relief may be granted should be denied.[17]

Dated: New York, New York
      May 5, 2008

Respectfully submitted,

TANNENBAUM HELPERN
  SYRACUSE & HIRSCHTRITT, LLP

By:    /s/ L. Donald Prutzman
        L. Donald Prutzman (LP 1327)
900 Third Avenue
New York, New York 10022
(212) 508-6700
  Attorneys for Plaintiff

---

[17] In the event that the Court determines that General Electric's motion should be granted as to any claims, BroadVision respectfully requests leave to replead such claims in an Amended Complaint.

25